**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VINMAR OVERSEAS, LTD.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:08-cv-01440** |
| | § | |
| **E-BIOFUELS, LLC,** | § | |
| | § | |
| **Defendant.** | § | |

<u>**VINMAR'S TRADITIONAL AND NO-EVIDENCE**</u>
<u>**MOTION FOR SUMMARY JUDGMENT**</u>

**TO THE HONORABLE EWING WERLEIN, JR.:**

Stephen H. Lee
State Bar No. 00791092
So. District Bar No. 18313

**DOYLE, RESTREPO, HARVIN & ROBBINS, L.L.P.**
600 Travis Street, Suite 4700
Houston, Texas 77002
(713) 228-5100 (telephone)
(713) 228-6138 (facsimile)
<u>slee@drhrlaw.com</u> (e-mail)

**ATTORNEY-IN-CHARGE FOR PLAINTIFF,**
**VINMAR OVERSEAS, LTD.**

## TABLE OF CONTENTS

TABLE OF CONTENTS....................................................................................................ii

TABLE OF AUTHORITIES ............................................................................................iv

I.   NATURE AND STAGE OF THE PROCEEDING.................................................1

II.  SUMMARY OF THE ARGUMENT .....................................................................1

III. BACKGROUND FACTS .......................................................................................3

IV.  ISSUES PRESENTED AND STANDARD OF REVIEW .....................................6

V.   ARGUMENTS AND AUTHORITIES ...................................................................8

    A.   Vinmar and e-biofuels Entered Into Binding Agreements
        for Sale and Purchase of 1,500,000 Gallons of Biodiesel
        and e-biofuels' Failure to Deliver the Required Volumes
        Constituted Breach of Those Agreements ......................................................8

    B.   e-biofuels' Breach Was Not Excused .............................................................9

        1.   Vinmar timely posted a satisfactory letter of credit ..................................10

        2.   e-biofuels cannot rely on Vinmar's alleged
            nonpayment for the two railcars because Vinmar's
            letter of credit suspended its obligation to pay ..........................................12

        3.   e-biofuels cannot rely on Vinmar's alleged default
            because e-biofuels failed to timely raise those
            complaints and further misled Vinmar into
            believing that e-biofuels instead was in default but
            still intended to complete performance ......................................................14

    C.   Vinmar Is Entitled to Undisputed Damages Resulting From
        e-biofuels' Breach.........................................................................................19

        1.   The UCC requires a liberal administration of
            remedies......................................................................................................19

        2.   Vinmar's undisputed damage evidence.....................................................20

        3.   Vinmar is entitled to attorneys' fees.........................................................23

VI.   CONCLUSION ...................................................................................................24

CERTIFICATE OF SERVICE ....................................................................................25

## TABLE OF AUTHORITIES

### *Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................7, 8

*In re AOV Industries, Inc.*, 64 B.R. 933 (Bankr. D.D.C. 1986) ......................................13

*Canusa Corp. v. A & R Lobosco, Inc.*, 986 F. Supp. 723 (E.D.N.Y. 1997) ....................23

*Cargill, Inc. v. Stafford*, 553 F.2d 1222 (10th Cir. 1977)................................................21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).............................................................7, 8

*Consolidated Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188 (Tex. 1985)................17

*Cosden Oil & Chemical Co. v. Karl O Helm Akiengesellschaft*,
    736 F.2d 1064 (5th Cir. 1984) .......................................................................21

*Cushman & Wakefield, Inc. v. Fletcher*,
    915 S.W.2d 538 (Tex. App.—Dallas 1995, writ denied) ..................................24

*Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*,
    992 F. Supp. 913 (S.D. Tex. 1998).................................................................9

*DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421 (5th Cir. 2003)...................................24

*Johnson & Higgins of Tex. Inc. v. Kenneco Energy, Inc.*,
    962 S.W.2d 507 (Tex. 1998) .........................................................................24

*Kiewit Tex. Mining Co. v. Inglish*,
    865 S.W.2d 240 (Tex. App.—Waco 1993, writ denied) ...................................11

*Koppers Co. v. Brunswick Corp.*, 303 A.2d 32 (Pa. Super. Ct. 1973) ..............17, 18, 19

*Laredo Hides Co. v. H & H Meat Products Co.*,
    513 S.W.2d 210 (Tex. Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.) .......13

*Lone Star Ford, Inc. v. McCormick*,
    838 S.W.2d 734 (Tex. App.—Houston [1st Dist.] 1992, writ denied).............23

*Mace v. City of Palestine*, 333 F.3d 621 (5th Cir. 2003)..................................................8

*Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*,
    255 S.W.3d 807 (Tex. App.—Dallas 2008, no pet.) ......................................24

*Precision Pine & Timber, Inc. v. U.S.*, 63 Fed. Cl. 122 (2004)................................................22, 23

*Preload Technology, Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080 (5th Cir 1983) .....................13

*Seguros Caracas de Liberty Mut., S.A. v. Goldman Sachs & Co.*,
     502 F. Supp.2d 183 (D. Mass. 2007)...............................................................................20

*Seismic & Digital Concepts, Inc. v. Digital Resources Corp.*,
     590 S.W.2d 718 (Tex. Civ. App.—Houston [1st Dist.] 1979, no writ)...........................17

### *Other Authorities*

FED. R. CIV. P. 56(c) ..............................................................................................................7, 8

TEX. BUS. & COM. CODE § 1.103...............................................................................................17

TEX. BUS. & COM. CODE § 1.305.........................................................................................19, 23

TEX. BUS. & COM. CODE § 2.201(a) ...........................................................................................9

TEX. BUS. & COM. CODE § 2.325.........................................................................................7, 13

TEX. BUS. & COM. CODE § 2.609.......................................................................................11, 13

TEX. BUS. & COM. CODE § 2.713...............................................................................................20

TEX. BUS. & COM. CODE § 2.715.........................................................................................20, 21

TEX. BUS. & COM. CODE § 2.723.........................................................................................20, 21

TEX. FIN. CODE § 304.003 .........................................................................................................24

TEX. PRAC. & REM. CODE § 38.001, *et seq.* ..............................................................................23

**TO THE HONORABLE EWING WERLEIN, JR.:**

Plaintiff Vinmar Overseas, Ltd. files this traditional and no-evidence motion for summary judgment seeking judgment as a matter of law awarding Vinmar damages it suffered as a result of Defendant e-biofuels, LLC's failure to deliver the contractually required volumes of biodiesel to Vinmar. In support of this motion, Vinmar would respectfully show the Court as follows:

## I.
### NATURE AND STAGE OF THE PROCEEDING

1.      In early 2008, Vinmar brought this breach of contract action in state court against e-biofuels for its failure to deliver the contractually required quantities of biodiesel. In May 2008, e-biofuels removed the case to this Court, and the parties have completed discovery including written discovery and depositions, except that e-biofuels failed to produce Brent Reynolds—its purported expert on damages—for properly-noticed depositions. Mr. Reynolds' proposed testimony is subject to Vinmar's motion to strike concurrently filed with this motion. The discovery period ended on June 18, 2009, and no further discovery is pending or contemplated at this time. The docket call in this case is set for November 6, 2009.

## II.
### SUMMARY OF THE ARGUMENT

2.      Vinmar and e-biofuels entered into two separate agreements under which e-biofuels agreed to ship a total of 1,500,000 gallons of FAME B99, a type of biodiesel, to Vinmar. Under the first agreement, e-biofuels was required to provide a total of 1 million gallons to Vinmar at $2.25 per gallon at a rate of 500,000 gallons per month or 125,000 gallons per week during the January-February 2008 period. Under the second contract, e-biofuels was required to similarly ship 500,000 gallons in March 2008. But, from the very beginning, e-biofuels was in default and provided one excuse after another for not being able to meet the required schedule.

Initially, e-biofuels claimed that track maintenance and spur issues prevented the shipment of the required quantities for the week of January 7. Then, after shipping only two railcars totaling 50,000 gallons in mid-January 2008, e-biofuels stopped shipping any more gallons and Vinmar began demanding e-biofuels' compliance with the contract schedule. In its contemporaneous communications, e-biofuels kept apologizing that it could not meet the "required volume" due to "moisture" and other "production" problems and promising to play "catch up" on the required volume.

3.    On March 4, 2008, through a letter prepared by its counsel, e-biofuels repudiated its contract obligations with Vinmar and, to Vinmar's utter surprise and contrary to its prior communications, e-biofuels claimed that it had no obligation to perform under the agreements because Vinmar allegedly failed to post a "line of credit" or pay for e-biofuels' product. In this repudiation letter, e-biofuels also mentioned production problems and other issues unrelated to Vinmar as reasons for its non-shipment. e-biofuels even claimed that no contract existed! e-biofuels now takes the position that Vinmar's failures to post a letter of credit and pay for shipments are the only reasons why e-biofuels did not complete its performance. In their depositions, e-biofuels' two principals went so far as to deny having any knowledge concerning the preparation of this repudiation letter, while each witness testified that the other helped prepare it. Not only is e-biofuels' assertion groundless because Vinmar timely posted a satisfactory letter of credit that paid for the two railcars e-biofuels shipped, but it is an obvious attempt to fabricate an after-the-fact excuse for its breach. Thus, Vinmar is entitled to summary judgment and recovery $1,958,468—the amount of undisputed damages—and $100,000 in attorneys' fees and expenses.

## III.
## BACKGROUND FACTS

4.      On January 3, 2008, Vinmar and e-biofuels entered into two separate agreements for the sale and purchase of biodiesel through a mutual broker IVG Energy.  (Ex. A, First Agreement); (Ex. B, Second Agreement).[1]  Under the First Agreement, e-biofuels agreed to sell and Vinmar agreed to buy 500,000 gallons of FAME B99 per month for January and February 2008 at $2.25 per gallon.  (Ex. A, First Agreement).  The agreement required e-biofuels to load five railcars a week, totaling 20 railcars a month, and designated the Vopak terminal in Deer Park, Texas, as the delivery point.  (*Id.*)  Vinmar was to post a revolving letter of credit every two weeks.  (Ex. A, First Agreement).  The Second Agreement required e-biofuels' delivery of 500,000 gallons in March 2008 at $2.50 per gallon.  (Ex. B, Second Agreement).  In all other respects, it is identical to the First Agreement.  (*Id.*)

5.      On January 4, pursuant to e-biofuels' instruction, Vinmar posted a letter of credit naming e-biofuels as the beneficiary.  (Ex. D, 1/4/08 E-mail From B. Carmichael to K. Donnell, et al.); (Ex. E, Letter of Credit Dated 1/4/08).  To satisfy the revolving nature of the letter of credit, e-biofuels approved Vinmar to open a letter of credit in the amount of $562,500 (i.e., 2 weeks' worth of shipments) with an expiration date of April 30, 2008 to cover the expected performance periods under the two agreements, but without an automatic reduction clause.  (Ex. D, 1/4/08 E-mail From B. Carmichael to K. Donnell, et al.).  e-biofuels then requested that its bank, Old National, be named an additional beneficiary, and Vinmar promptly requested an amendment to name both e-biofuels and Old National as beneficiaries to the letter of credit.  (Ex. G, 1/7/08 E-mail Chain re Request for Amendment).  e-biofuels and Old National apparently disagreed on the specifics of the naming of dual beneficiaries and, on January 9, e-biofuels

---

[1]    For ease of reference, the parties' communications are numbered chronologically, followed by deposition transcripts and other documents.

changed its amendment request and asked Vinmar to name Old National as the sole beneficiary.
(Ex. H, 1/9/08 E-mail From K. Carrigan to K. Donnell, et al.).  Vinmar promptly ordered another
amendment to the letter of credit and the amendment was approved by Craig Ducey—e-biofuels'
president—on January 14.  (Ex. K, Dep. of C. Ducey, p. 108); (Ex. K, 1/14/08 Amendment to
Letter of Credit).

      6.     The agreements required e-biofuels to begin shipping during the week of January
7.  (Ex. C, January 4, 2008 E-mail From B. Carmichael to B. Burke).[2]  But, e-biofuels breached
this schedule from the get-go, claiming that track maintenance and spur issues prevented e-
biofuels from shipping any railcars that week and, on January 11, e-biofuels notified Vinmar that
it would begin shipments on January 14 and agreed to "play a little catch up on the volume."
(Ex. I, 1/11/08 E-mail From B. Carmichael to K. Donnell, et al.).  e-biofuels finally shipped the
first railcar on January 14 and the second railcar on January 16, totaling 50,000 gallons.  (Ex. L,
Paperwork for 1/14/08 and 1/16/08 Shipments).  Without receiving at least five railcars (and up
to ten railcars based on e-biofuels' promise to play "catch up") during that week, Vinmar began
demanding e-biofuels' compliance with the contract schedule.  (*See, e.g.*, Ex. N, 1/25/08 E-mail
From C. Lokey to B. Carmichael, et al.); (Ex. O, 1/29/08 E-mail From K. Donnell to B.
Carmichael, et al.).

      7.     Rather than shipping more railcars, e-biofuels concocted more excuses.  In its
contemporaneous communications, e-biofuels apologized for not being able to provide the
required gallons due to "moisture" and other "production" issues, but represented that additional
shipments were forthcoming and kept promising to "play catch up." (*See, e.g.*, Ex. N, 1/25/08 E-

---

[2]     e-biofuels designated the documents marked Exhibits A, B, C, F, and M as "confidential."  While
Vinmar disputes the confidentiality of these documents and e-biofuels did not strictly comply with the
designation procedure set forth in the parties' confidentiality agreement executed in this case, Vinmar
files these documents separately in a sealed envelope according to the agreement.

mail From B. Carmichael to K. Donnell, et al.); (Ex. O, 1/29/08 E-mail From B. Carmichael to K. Donnell, et al.); (Ex. P, 1/31/08 E-mail From B.Carmichael to C. Lokey, et al.). Relying on e-biofuels' promises, Vinmar patiently waited for its performance while continuing to demand product from e-biofuels. (Ex. M, E-mails Between B. Burke and B. Carmichael in late January and February); (Ex. X, Dep. of D. Friedman, pp. 136-37).

8.   Despite Vinmar's repeated demands and e-biofuels' continued promises to honor its contractual obligations, e-biofuels did not deliver another gallon of biodiesel to Vinmar after shipping two railcars in mid-January. (Ex. V, Dep. of C. Ducey, pp. 109, 156-57); (Ex. W, Dep. of B. Carmichael, pp. 88-90). In light of e-biofuels' failure to complete performance under the First Agreement, on March 3, Vinmar requested assurance from e-biofuels that it would perform under the Second Agreement. (Ex. Q, 3/3/08 Letter From D. Friedman to B. Carmichael). In response, through its counsel Paul Mullin, e-biofuels repudiated its contractual obligations and instructed Vinmar to find other suppliers. (Ex. S, 3/4/08 Letter From e-biofuels' Counsel to D. Friedman). To Vinmar's surprise, e-biofuels for the first time claimed that its contractual performance was excused due to Vinmar's alleged failure to post a "line of credit" and failure to make payment. (*Id.*)

9.   In its March 4 repudiation letter, e-biofuels also noted quality and production problems as causes of e-biofuels' non-performance. But, contrary to these explanations, its president Craig Ducey testified in his deposition that the only reasons for e-biofuels' refusal to ship the remaining 1,450,000 gallons were Vinmar's alleged failure to post an acceptable letter of credit and then pay for the two railcars it shipped in mid-January. (Ex. S, 3/4/08 Letter From e-biofuels' Counsel to D. Friedman); (Ex. V, Dep. of C. Ducey, pp. 156-57). Mr. Ducey claimed that e-biofuels could have shipped contractually required quantities if Vinmar had simply

satisfied these two conditions.  (Ex. V, Dep. of C. Ducey, pp. 156-57); (Ex. W, Dep. of Carmichael, p. 104-05) (after issuing the amendment, Vinmar's only failure was not paying for the first shipments).  Nonetheless, e-biofuels never notified Vinmar of these complaints as the bases for its non-performance and never declared Vinmar in default until it repudiated its contractual obligations on March 4, 2008. (Ex. W, Dep. of B. Carmichael, pp. 233-38).

10.    Significantly, in asserting this new theory, Mr. Ducey testified that he had no knowledge of the statements contained in the repudiation letter as he did not assist in the preparation of the letter.  (Ex. V, Dep. of C. Ducey, pp. 159-63).  Instead, Mr. Ducey testified that Mr. Carmichael was assisting e-biofuels' counsel.  (*Id.*)  Mr. Carmichael, on the other hand, also denied any knowledge concerning the explanations in the repudiation letter and testified that he was not "[a]t all" involved in the preparation of this letter, but Mr. Ducey was.  (Ex. W, Dep. of B. Carmichael, p. 242-47).

## IV.
### ISSUES PRESENTED AND STANDARD OF REVIEW

11.    e-biofuels does not dispute that the parties entered into two agreements that required e-biofuels to deliver a total of 1,500,000 gallons of biodiesel to Vinmar during the January-March 2008 period and that e-biofuels only delivered 50,000 gallons (or two railcars)— leaving 1,450,000 gallons undelivered under the agreements.  Thus, the only remaining issues on the merits are e-biofuels' affirmative defenses.  In its answer, e-biofuels asserted several "affirmative defenses," but its witnesses testified that e-biofuels' only excuse is Vinmar's failure to timely post a satisfactory letter of credit and to pay for the two railcars that e-biofuels shipped in mid-January 2008.  Thus, the following issued are presented for the Court's determination:

1.    Whether e-biofuels' failure to deliver the required quantities of biodiesel in breach of the parties' agreements was excused based on Vinmar's alleged failure to timely post an acceptable letter of credit and/or to pay for the two railcars that e-biofuels shipped in mid-January even though:

(i)    Vinmar posted a letter of credit in response to e-biofuels' instructions on the day after the parties entered into the agreements or otherwise seasonably furnished an agreed letter of credit.

Standard of Review:  Vinmar is entitled to judgment as a matter of law precluding this defense if there is no genuine issue of any material fact relating to Vinmar's timely issuance of a satisfactory letter of credit.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Summary judgment precluding this defense also is warranted if e-biofuels cannot make a sufficient showing that Vinmar failed to seasonably furnish an agreed letter of credit and such failure constituted a material breach of the agreements.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); TEX. BUS. & COM. CODE § 2.325(a).

(ii)    A satisfactory letter of credit was on file when payment for the two railcars allegedly became due.

Standard of Review:  Vinmar is entitled to judgment as a matter of law precluding this defense if there is no genuine issue of any material fact relating to Vinmar's placement of a satisfactory letter of credit when payment was due.  FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Summary judgment precluding this defense also is warranted if e-biofuels cannot make a sufficient showing that time was of the essence as to Vinmar's payment and that Vinmar's alleged failure to pay was a material breach.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

(iii)    Despite Vinmar's repeated demands for product, e-biofuels did not assert these complaints and did not declare Vinmar in default until it repudiated the agreements, but instead e-biofuels kept apologizing for not shipping the required volumes and kept promising to play "catch up."

Standard of Review:  Vinmar is entitled to judgment as a matter of law if there is no genuine issue as to any material fact relating to the preclusion of e-biofuels' claim of Vinmar's default based on its

failure to contemporaneously notify Vinmar of claimed default and its communications that led Vinmar to believe that e-biofuels instead was in default but still intended to perform under the agreements. FED. R. CIV. P. 56(c).

2.    Whether Vinmar is entitled to $1,958,468—the undisputed amount of damages it suffered as a result of e-biofuels' failure to deliver 1,450,000 gallons of biodiesel to Vinmar—and $100,000 in attorneys' fees and expenses.

Standard of Review:  Vinmar is entitled to judgment as a matter of law if there is no genuine issue as to any material fact relating to the amount of damages Vinmar suffered as a result of e-biofuels' failure to deliver 1,450,000 gallons of biodiesel to Vinmar and the amount of fees and expenses incurred in the prosecution of its claims against e-biofuels. FED. R. CIV. P. 56(c).

## V.
## ARGUMENTS AND AUTHORITIES

12.    Vinmar is entitled to summary judgment because the evidence conclusively establishes that e-biofuels failed to deliver the contractually required quantities of biodiesel to Vinmar and has no valid excuse for this failure. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003). Alternatively, Vinmar is entitled to no-evidence summary judgment because e-biofuels cannot produce sufficient evidence for each element of its affirmative defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  For e-biofuels' breach, Vinmar is entitled to $1,958,468— the undisputed amount of resulting damages—and $100,000 in attorneys' fees and expenses.

**A.    Vinmar and e-biofuels Entered Into Binding Agreements for Sale and Purchase of 1,500,000 Gallons of Biodiesel and e-biofuels' Failure to Deliver the Required Volumes Constituted Breach of Those Agreements.**

13.    It is undisputed that Vinmar and e-biofuels entered into two separate agreements for the sale and purchase of 1,500,000 gallons of biodiesel which are evidenced by IVG broker confirmations dated January 3, 2008.  (Ex. A); (Ex. B).  In their depositions, e-biofuels'

president and its sales director both testified that Vinmar and e-biofuels agreed to the terms of these confirmations. (Ex. V, Dep. of C. Ducey, p-. 43-44) ("e-biofuels and Vinmar agreed to those terms" in the broker confirmations); (*see also* Ex. W, Dep. of B. Carmichael, pp. 132-33) (e-biofuels "agreed to these terms" in the broker confirmations and no terms were missing).[3]

14.    Under the First Agreement, e-biofuels was required to deliver 1,000,000 gallons of biodiesel to Vinmar—500,000 gallons in January 2008 and another 500,000 gallons in February 2008—at a rate of 125,000 gallons (five railcars) per week. (Ex. A). The Second Agreement similarly required e-biofuels to deliver 500,000 gallons in March 2008. (Ex. B). Admittedly, e-biofuels only delivered 50,000 gallons—25,000 gallons on January 14 and another 25,000 gallons on January 16—under the First Agreement and repudiated its entire obligation under the Second Agreement. (Ex. V, Dep. of C. Ducey, pp. 109, 156-57); (Ex. W, Dep. of B. Carmichael, pp. 88-90); (*Id.* at 128) (each railcar holds approximately 25,000 gallons); (Ex. L, Paperwork for January 14 and January 16 Shipments); (Ex. Q, Vinmar's Request for Adequate Assurance Dated 3/3/08); (Ex. S, e-biofuels' Repudiation Letter Dated 3/4/08). Thus, the evidence conclusively establishes that Vinmar and e-biofuels entered into binding agreements and e-biofuels failed to deliver 1,450,000 gallons of biodiesel to Vinmar in breach of these agreements.

**B.    e-biofuels' Breach Was Not Excused.**

15.    Contrary to its contemporaneous explanations for its failure to honor its contractual obligations, e-biofuels now contends that it was justified in refusing to ship any more

---

[3]    While e-biofuels representatives' sworn admissions conclusively establishes the existence of an enforceable agreement between the parties, courts have held that broker confirmations alone constitute written evidence of binding agreements between merchants under UCC section 2.201(a). *See, e.g., Den Norske Stats Oljeselskap, A.S. v. Hydrocarbon Processing, Inc.*, 992 F. Supp. 913, 915 (S.D. Tex. 1998) (*citing* TEX. BUS. & COM. CODE § 2.201(a)) (Hughes, J.); (Ex. W, Dep. of B. Carmichael, p. 64) (agreeing that IVG was working "as a middleman or broker to put two parties together"); (*see also Id.* at 40, 71-72).

product to Vinmar because Vinmar allegedly breached the agreements first by failing to timely

post an appropriate letter of credit and then failing to pay for the two railcars that were shipped in

mid-January 2008.  (Ex. V, Dep. of C. Ducey, pp. 156-57).  e-biofuels' current position has no

merit and, even so, e-biofuels' reliance on previously unstated complaints as a litigation posture

must be rejected, especially where e-biofuels misled Vinmar into believing that e-biofuels still

intended to fulfill its contractual obligations.

      **1.**     **Vinmar timely posted a satisfactory letter of credit.**

      16.     The parties' agreements required Vinmar to "post a revolving [letter of credit]

every two weeks."  (Ex. A); (Ex. B).  Vinmar complied with this provision immediately by

issuing a letter of credit on the next day as e-biofuels instructed.  On January 4, Vinmar

presented a draft letter of credit to e-biofuels naming e-biofuels as the beneficiary according to

the general practice in the industry to name the supplier as the beneficiary in the absence of a

specific contract provision to the contrary.  (Ex. E, Letter of Credited Dated 1/4/08); (Ex. Y,

Dep. of C. Lokey, pp. 71-72); (Ex. V, Dep. of C. Ducey, p. 61) ("the beneficiary of the contract

is e-biofuels").  The revolving nature of the letter of credit was satisfied through the deletion of

an automatic reduction clause and the extension of the expiration date to April 30, 2008 to cover

the expected performance periods.  (Ex. D, 1/4/08 E-mail From B. Carmichael to K. Donnell, et

al.).  Mr. Carmichael approved the draft and instructed Vinmar, "This copy will work fine" and

"[p]lease move forward and execute."  (Ex. C, 1/4/08 E-mail From B. Carmichael to K. Donnell,

et al.).

      17.     e-biofuels then requested that Old National be named an additional beneficiary.

(Ex. C, 1/4/08 E-mail From B. Carmichael to K. Donnell, et al.).  Although the agreements did

not require that Old National be named a beneficiary, Vinmar complied with this request by

issuing an amendment naming Old National as the beneficiary on January 14. (*See, e.g.*, Ex. V, Dep. of C. Ducey, p. 85) (acknowledging that the contract did not that Old National must be designated a beneficiary to the letter of credit); (*Id.* at 108-09); (Ex. K, 1/14/08 Amendment to Letter of Credit). Mr. Ducey signed and approved the amendment as to both "form and content" on January 14. (Ex. V, Dep. of C. Ducey, p. 108); (Ex. K, 1/14/08 Amendment to Letter of Credit).[4] e-biofuels does not claim that Vinmar's amendment on January 14 was untimely. (Ex. V, Dep. of C. Ducey, p. 108).[5]

18. e-biofuels' current contention that Vinmar's January 4 letter of credit was not satisfactory or was not a letter of credit "e-biofuels could work with" is a pure fabrication. (Ex. W, Dep. of B. Carmichael, p. 73-74). On January 7, Mr. Carmichael informed IVG that "[c]redit is all set up and LC has been established." (Ex. F, January 7, 2008 E-mail From B. Carmichael to B. Burke). In fact, Mr. Ducey testified that, if he were in Mr. Carmichael's shoes, he would have specifically instructed Vinmar, "If [Old National is] an additional beneficiary, please move

---

[4]     Mr. Ducey contends that Vinmar was required to post a letter of credit every two weeks regardless of e-biofuels' performance or expected shipping schedule. (Ex. V, Dep. of C. Ducey, pp. 121, 163). Mr. Ducey's testimony ignores e-biofuels' prior approval of Vinmar's proposal to satisfy this requirement by deleting the "automatic reduction clause" and keeping the letter of credit open until April 30—a month after the expiration of the contract periods. (Ex. C, 1/4/08 E-mail From B. Carmichael to K. Donnell, et al.) (approving format of draft letter of credit); (Ex. W, Dep. of B. Carmichael, pp. 104-05) (after issuing the amendment, Vinmar's only failure was not paying for the first shipments). In addition, e-biofuels' failure to deliver five railcars a week and refusal to provide an expected shipping schedule despite Vinmar's repeated demands rendered any alleged requirement to post another letter of credit moot. *See, e.g., Kiewit Tex. Mining Co. v. Inglish*, 865 S.W.2d 240, 245 (Tex. App.—Waco 1993, writ denied) ("Non-occurrence of a condition is legally excused when a party's repudiation contributes materially to its non-occurrence"); *see also* TEX. BUS. & COM. CODE § 2.609 (suspending performance until assurance of counter-performance is provided). Mr. Ducey's speculative opinion also has no probative value because he admittedly has "no clue how [automatic reduction clause] works." (Ex. V, Dep. of C. Ducey, p. 112).

[5]     Mr. Carmichael testified that Vinmar did not timely issue a proper amendment based on his belief that a satisfactory amendment was not issued until January 22. (Ex. W, Dep. of B. Carmichael, pp. 170-74). Mr. Carmichael did not know whether the January 14 amendment was satisfactory to e-biofuels and deferred that determination to Mr. Ducey. (Ex. W, Dep. of B. Carmichael, pp. 170-74).

forward and execute" and that it would have been "bad business" to instruct Vinmar to issue a letter of credit that did not work. (Ex. V, Dep. of C. Ducey, p. 92, 98).

19.     e-biofuels also cannot meet Vinmar's no-evidence challenge to its claim of untimely letter of credit because e-biofuels does not have sufficient evidence showing that Vinmar failed to seasonably furnish an agreed letter of credit. e-biofuels' burden is particularly onerous here because Vinmar posted an agreed letter of credit on January 4. But, even assuming an agreed letter of credit was not furnished until January 14, most, if not all, of any delay from January 4 to January 14 was caused by e-biofuels' and Old National's inability to "agree[] on all points," and Mr. Carmichael testified that Vinmar acted in "good faith" to comply with e-biofuels' request to name Old National as a beneficiary. (Ex. J, 1/11/08 E-mail From K. Donnell to K. Carrigan, et al.); (Ex. H, 1/9/08 E-mail From K. Carrigan to K. Donnell, et al.); (Ex. W, Dep. of B. Carmichael, p. 87). Further, e-biofuels' physical inability to ship the product until January 14 due to alleged track maintenance and spur issues and its admission that Vinmar had a satisfactory letter of credit in place on January 14 eviscerate any argument that Vinmar's letter of credit was untimely. Thus, e-biofuels cannot demonstrate that Vinmar's alleged failure to furnish an agreed letter of credit until January 14 constituted a material breach of contract.

> **2.    e-biofuels cannot rely on Vinmar's alleged nonpayment for the two railcars because Vinmar's letter of credit suspended its obligation to pay.**

20.     e-biofuels cannot excuse itself of the obligation to ship the remaining quantities of biodiesel by claiming that Vinmar failed to pay for the shipments of two railcars because Vinmar had posted a satisfactory letter of credit as early as January 4 and, at the latest, on January 14.[6]

---

[6]     e-biofuels contends that the agreements required Vinmar to pay within 15 days of loading biodiesel into its railcars in Indiana and, thus, payments for two shipments in mid-January allegedly became due on January 29 and 31, respectively. (Ex. V, Dep. of C. Ducey, p. 119). However, the agreement unambiguously requires payment "net 15 days after delivery" and designates the delivery point as the Vopak terminal in Deer Park, Texas. (Ex. A); (Ex. B). e-biofuels' construction of the contract

Pursuant to Texas UCC section 2.325, this letter of credit "suspend[ed] [Vinmar's] obligation to pay." TEX. BUS. & COM. CODE § 2.325; *see also In re AOV Industries, Inc.*, 64 B.R. 933, 940-41 (Bankr. D.D.C. 1986) (letter of credit suspends buyer's obligation to pay and obligation is revived only if letter of credit is dishonored and seller demands direct payment from buyer) (Ex. AA).  Consistent with this rule, Mr. Ducey understood that e-biofuels was going to get paid either by wire or a letter of credit once the letter of credit was posted.  (Ex. V, Dep. of C. Ducey, p. 67).  The letter of credit was never dishonored and, in fact, on March 4, Old National on e-biofuels' behalf obtained payment for e-biofuels' shipment of two railcars by drawing down on the letter of credit.  (Ex. R, 3/5/08 Notification of Payment From Bank of America).[7]  Thus, Vinmar's alleged failure to pay did not excuse e-biofuels' performance as a matter of law.

21.    Vinmar also is entitled to no-evidence summary judgment precluding this alleged defense because e-biofuels cannot produce sufficient evidence showing that time was of the essence as to Vinmar's payment for the two railcars.  This is especially so where an admittedly satisfactory letter of credit had been posted when the payment allegedly became due, e-biofuels had no definite schedule to resume shipment of railcars, and e-biofuels did not complain of Vinmar's nonpayment until it repudiated the agreements.

terms are unreasonable and contradicted by its failure to complain about lack of payment in response to Vinmar's repeated demands for product throughout February 2008.

[7]    Vinmar had neither obligation nor reason to replenish the letter of credit after it was drawn down on because, on March 3, Vinmar had requested assurance from e-biofuels of its intent to resume performance and, until e-biofuels provide adequate assurance, Vinmar's performance was suspended. TEX. BUS. & COM. CODE § 2.609 ("When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.").  In light of e-biofuels' continued failure to ship pursuant to the contract schedule and repudiation of future obligations, Vinmar's replenishment of the letter of credit would have been a useless, as well as wasteful, act, especially where approximately $450,000 still was available through the letter of credit. *See, e.g., Preload Technology, Inc. v. A.B. & J. Construction Co.*, 696 F.2d 1080, 1086-87 (5th Cir. 1983) (plaintiff was not "required to do the obviously useless act"); *Laredo Hides Co. v. H & H Meat Products Co.*, 513 S.W.2d 210, 220-21 (Tex. Civ. App.—Corpus Christi 1974, writ ref'd n.r.e.) (holding that seller's repudiation rendered buyer's performance useless).

**3.      e-biofuels cannot rely on Vinmar's alleged default because e-biofuels failed to timely raise those complaints and further misled Vinmar into believing that e-biofuels instead was in default but still intended to complete performance.**

22.      Not only does e-biofuels' current contention that Vinmar's breach excused its contractual performance lack merit, but e-biofuels waived those complaints by failing to contemporaneously complain.   The alleged untimeliness of the letter of credit and lack of payment never were an issue with e-biofuels until it decided to repudiate the agreements with Vinmar.  The need for e-biofuels to explain the reasons it may have harbored in refusing to ship more product was apparent, and e-biofuels' failure to do so timely deprived Vinmar of any opportunity to address e-biofuels' complaints.  Simply, e-biofuels' current contention is nothing more than its attempt to manufacture an excuse for its breach.

23.      Pursuant to the contract schedule, Vinmar expected five railcars of biodiesel every week.   When e-biofuels failed to comply with this schedule, Vinmar began demanding performance, but e-biofuels never complained of Vinmar's alleged defaults it now claims.  Both Mr. Ducey and Mr. Carmichael testified that Vinmar's failure to timely post an acceptable letter of credit and pay for the initial shipments are the reasons why e-biofuels did not deliver any more gallons to Vinmar under the parties' agreements.  (Ex. V, Dep. of C. Ducey, pp. 108-09); (Ex. W, Dep. of B. Carmichael, p. 89).  Further, despite its prior communications, e-biofuels now says Vinmar is the only one to be blamed because e-biofuels was producing at its full capacity throughout the contract periods and had the product available to deliver and that it was refusing to ship any more gallons only because it was not paid for the two railcars it shipped in mid-January.  (Ex. V, Dep. of C. Ducey, pp. 153, 156-57); (Ex. W, Dep. of B. Carmichael, p. 89-90).  However, e-biofuels did not contemporaneously complain of Vinmar's alleged defaults despite

Vinmar's repeated demands for e-biofuels' performance.  (Ex. W, Dep. of B. Carmichael, pp. 91-95, 208-09).

24.       Instead, e-biofuels claimed that quality and other production issues caused delays and kept apologizing for its inability to meet the required schedule and kept promising to play "catch up."  For example, on January 11, Mr. Carmichael wrote to Vinmar that due to track maintenance and spur issues, e-biofuels could not begin shipments until January 14 at the earliest and agreed to "play a little catch up on the volume."  (Ex. I, 1/11/08 E-mail From B. Carmichael to K. Donnell, et al.).  This is contrary to e-biofuels' present contention that it refused to ship any product until the letter of credit was amended to name Old National as a beneficiary—which happened on January 14.

25.       e-biofuels' campaign to mislead Vinmar continued.  On January 29, in response to Vinmar's repeated demands for product, Mr. Carmichael explained:

> We have been unable to hit the water specification requested.  The product, outside this requirement, meets ASTM and EN requirements.  Our additional capacity is due online Feb 15th and our hope is that this will trend the aggregate product down in water content.  *As a result we have not met our required volume commitments and apologize for this oversight and production problems.*

(Ex. O, 1/29/08 E-mail From B. Carmichael to K. Donnell, et al.) (emphasis added). Significantly, there is no mention of Vinmar's failure to timely post a letter of credit or pay for the two railcar shipments.[8]  Two days later, Mr. Carmichael wrote to Vinmar and again asked for Vinmar's leniency:

---

[8]       On January 25, e-biofuels suggested that it did "not have the LC in place."  (Ex. N, 1/25/08 E-mail From B. Carmichael to K. Donnell, et al.).  Vinmar immediately refuted this statement and, as he testified in his deposition, Mr. Carmichael learned that he was mistaken and a proper letter of credit was in place. (Ex. N, 1/25/08 E-mail From C. Lokey to B. Carmichael, et al.); (Ex. W, Dep. of B. Carmichael, p. 184).

> Unfortunately the situation has not improved.  Our moisture are
> [sic] required spec of 400 ppm has not trended down and I am
> concerned of being over that spec at load and delivery.  Not
> delivering product or meeting spec are my two fears and that is the
> situation that I am faced with.  The additional volume was due
> online by outside suppliers in January.  That date was pushed to
> Feb 15th and as of today March 1st.  You are my first direction for
> fuel once this is online to play catch up.

(Ex. P, 1/31/08 E-mail from B. Carmichael to C. Lokey).  Vinmar continued to demand e-biofuels' contractual performance throughout February.  (Ex. X, Dep. of D. Friedman, p. 88); (Ex. M, E-mails Between B. Burke and B. Carmichael).  But, despite numerous opportunities to do so, e-biofuels never claimed that its obligations were excused due to Vinmar's alleged failure to timely post a letter of credit or to pay for the two railcars until it repudiated the agreements. (Ex. S, 3/4/08 Repudiation Letter).

     26.    During his deposition, when asked why he did not explain e-biofuels' alleged excuse for not supplying the product to Vinmar, Mr. Carmichael could only say, "Calling . . . these guys out of line or late on payment or in arrears on getting a proper stand-by letter of credit is not good customer service" and "[i]t's not my job to tell Vinmar when their payables are due." (Ex. W, Dep. of B. Carmichael, p. 208).  Mr. Ducey, on the other hand, understood the need for honest communications and timely assertion of complaints under these circumstances:

> Q.    [If you were] the buyer.  There's a seller.  The seller's not
> giving you the product as you know, expected.  And you
> say, Where's my product?  Where's my product?  And that
> has happened in your business, right?
>
> A.    Yes.
>
> Q.    And if they . . . have a reason, then you want them to tell
> you if you honestly believe that you're entitled to the
> product, don't you?
>
> A.    In general, I'd want them to tell me, but I—I know that
> they don't tell me the honest reasons.

Q.      So you're left in the dark in that case, right?

A.      I don't know.  In that case, I guess, yes.

Q.      You guess what?

A.      That we would be left in the dark.

(Ex. V, Dep. of C. Ducey, pp. 147-48).

27.     The UCC and case authorities agree with Mr. Ducey and do not allow one to remain silent while harboring unstated claims of default and later contend that its performance was excused based on those unstated complaints.  *See, e.g., Consolidated Eng'g Co. v. Southern Steel Co.*, 699 S.W.2d 188, 191 (Tex. 1985) ("A party may affirm a contract that has been breached in one of two ways: (1) by evidencing a conscious intent to do so; or (2) by acting so as to induce the other party's detrimental reliance, thereby creating an estoppel situation."); *Seismic & Digital Concepts, Inc. v. Digital Resources Corp.*, 590 S.W.2d 718, 721 (Tex. Civ. App.— Houston [1st Dist.] 1979, no writ) (finding waiver of objection to contractual performance delay based on complaining party's failure to timely object and misleading conduct); TEX. BUS. & COM. CODE § 1.103 (explicit incorporation of the principles of law and equity including estoppel).

28.     The opinion in *Koppers Co. v. Brunswick Corp.*, 303 A.2d 32 (Pa. Super. Ct. 1973) (Ex. BB), is instructive.   In that case, Universal—subcontractor to a government contract—requested that general contractor Brunswick obtain a waiver from the government because its product did not meet the specifications of the contract while the deviation did not affect the product's quality or performance.  *Id.* at 35.  Brunswick advised Universal that the original shipment date had been extended and suggested that a waiver request had been submitted.  *Id.* at 35-36. In reliance of this notification, Universal did not ship the product as

originally scheduled. *Id.* at 36. While awaiting further shipping instructions, Universal received

a termination notice from the general contractor based on a provision that allowed Brunswick to

cancel the contract for the convenience of the government by paying a termination penalty. *Id.*

No other reason for termination was provided to Universal.   Then, in accordance with this

termination provision, Universal applied for a termination penalty. *Id.*  However, to Universal's

surprise, Brunswick denied the application claiming that Universal's inventory was acquired and

fabricated under another contract which was settled at no cost to the Government. *Id.* at 37.

Later, Universal further claimed that the product defect constituted a ground of Universal's

default and Brunswick does not owe a terminal penalty.   The trial court refused to allow

Brunswick's belated complaints and directed verdict in Universal's favor. *Id.* at 34. In affirming

the trial court, the appellate court reasoned:

> Universal . . . justifiably believed that Brunswick had submitted its
> request for waiver of out of tolerance conditions. . . .  In reliance
> on those assurances, Universal set back its delivery date until
> further 'formal notification' of waiver. . . .
>
> Once the matter had entered the termination phase, Brunswick
> further demonstrated the immateriality of those defects by both
> failing to notify Universal of findings from tests conducted in
> October of 1966 and by failing to notify the Government of the
> existence of defects.  Instead, Brunswick offered as the sole reason
> for terminating its contract with Universal the termination of the
> prime contract for convenience.  Furthermore, on two occasions, as
> much as a year after discovering the alleged defects, Brunswick
> communicated to the Government that Universal's proposal for
> settlement was 'fair and reasonable' and 'negotiated in good faith,'
> *without the slightest mention of defects.*
>
> *The overall effect of Brunswick's conduct was to estop defendant
> from raising any defense of defect on the part of Universal to
> establish default.*
>
> *The simple and plain fact is that the termination of the Purchase
> Order had absolutely nothing to do with any default or failure to
> perform by Universal. . . .*

*Id.* at 39-40 (emphasis added).

29.     During the contract performance, e-biofuels never complained of Vinmar's alleged defaults as the basis for its failure to provide the product and indeed kept apologizing and promising to "catch up" on the required volume.  Further, rather than complaining of Vinmar's non-performance in response to Vinmar's demands for product, e-biofuels blamed quality and other production issues for e-biofuels' non-performance.  Under these circumstances, e-biofuels as a matter of law is estopped from claiming it was excused from performance based on Vinmar's alleged defaults by failing to timely post a letter of credit or pay for the two railcars.

**C.     Vinmar Is Entitled to Undisputed Damages Resulting From e-biofuels' Breach.**

30.     Vinmar's undisputed expert evidence establishes that it suffered $1,958,468 in damages, consisting of $769,500 in market differential damages and $1,188,968 in consequential damages, as a result of e-biofuels' failure to deliver the remaining 1,450,000 gallons under the agreements.  In addition to recovery of these amounts, Vinmar is entitled to $100,000 in attorneys' fees and expenses.

**1.     The UCC requires a liberal administration of remedies.**

31.     Section 1.305 of the UCC provides that the UCC's remedies must be liberally administered to ensure that the aggrieved party is put in as good a position as if the other party had performed.  TEX. BUS. & COM. CODE § 1.305.  The Official Comments elaborate on this concept, making it clear that the UCC is not to be subjected to "unduly narrow" or "technical" interpretations.  *Id.* at cmt. 1.  The UCC further rejects the notion that damages must be calculable with "mathematical accuracy."  *Id.*  "Compensatory damages are often at best approximate: they have to be proved with whatever definiteness and accuracy the facts permit, but no more."  *Id.*

**2.     Vinmar's undisputed damage evidence.**

32.     Vinmar is entitled to recover the damages it sustained as a result of e-biofuels'

breach.  Section 2.713 of the UCC provides the framework for Vinmar's damage model:

> Subject to the provisions of this chapter with respect to proof of
> market price (Section 2.723), the measure of damages for non-
> delivery or repudiation by the seller is *the difference between the*
> *market price at the time when the buyer learned of the breach and*
> *the contract price together with any incidental and consequential*
> *damages provided in this chapter (Section 2.715), but less*
> *expenses saved in consequence of the seller's breach.*

TEX. BUS. & COM. CODE § 2.713.  Vinmar's damages were computed under this provision of the

UCC and the applicable case law.

33.     Vinmar's Damage Report is the only expert opinion in this case and establishes

that Vinmar suffered $1,958,468 in actual damages.[9] (Ex. X, Dep. of Friedman, p. 13); (Ex. T,

Vinmar's Damage Report, p. 1).   In summary, Vinmar began realizing in February 2008 that e-

biofuels was not going to honor its contractual commitments under the First Agreement. (Ex. X,

Dep. of D. Friedman, pp. 136-37); (Ex. T, Vinmar's Damage Report).   Accordingly, Vinmar

used the average price of the product as a benchmark in calculating the market-differential

damage for the 950,000 gallons owed under that contract. (Ex. X, Dep. of D. Friedman, p. 136);

(Ex. T, Vinmar's Damage Report).   The prices in January were not used because Vinmar was

told in January and into February that e-biofuels intended to honor the contract and would "catch

up" on the volume. (*Id.*); *see also, e.g., Seguros Caracas de Liberty Mut., S.A. v. Goldman Sachs*

*& Co.*, 502 F. Supp. 2d 183, 188-89 (D. Mass. 2007) (breach did not occur until seller told buyer

of its repudiation of the contract because seller repeatedly assured buyer that it would perform).

---

[9]     e-biofuels produced rebuttal opinions prepared by its purported damages expert Brent Reynolds.
However, as more fully discussed in Vinmar's motion to strike concurrently filed with this motion, e-
biofuels twice failed to produce Brent Reynolds for properly noticed depositions, and his proposed
testimony should be stricken. Thus, Vinmar's damages opinions are uncontroverted.

As to the Second Agreement, Vinmar selected the average price in March 2008 rather than the price on March 4—the date of repudiation—because, among other reasons, Vinmar was a volume seller and could not have replaced the volume it lost as a result of e-biofuels' failure to deliver the product and the agreements required e-biofuels to ratably ship railcars. *See, e.g., Cosden Oil & Chemical Co. v. Karl O Helm Akiengesellschaft*, 736 F.2d 1064, 1072 (5th Cir. 1984) ("When a buyer chooses not to cover, but to seek damages, the market is measured at the time he could have covered—a reasonable time after repudiation."); *Cargill, Inc. v. Stafford*, 553 F.2d 1222, 1227 (10th Cir. 1977) (if cover is not available, damage should be calculated based on the difference between the contract price and the price on the date performance is due); (Ex. X, Dep. of D. Friedman, pp. 127-28, 133); (Ex. T, Vinmar's Damage Report).

34.     Vinmar also is entitled to the recovery of the profit it would have realized through the resale of the biodiesel to the intended market in Europe as consequential damages. TEX. BUS. & COM. CODE § 2.715.  Pursuant to sections 2.715, and 2.723 of the UCC, Vinmar calculated consequential damages based on the sales prices in Europe Vinmar expected to realize but for e-biofuels' failure to perform.  (*See, e.g.*, Ex. X, Dep. of D. Friedman, pp. 144-50); (Ex. T, Vinmar's Damage Report).  Vinmar used the market prices reported by Starsupply Renewables and, because Starsupply did not report the prices of biodiesel with the exact CFPP value, Vinmar used the average of two price benchmarks which provided a reasonable estimate for e-biofuels' product.[10]  (*See, e.g.*, Ex. X, Dep. of D. Friedmsn, pp. 144-50, 170); TEX. BUS. & COM. CODE § 2.723 (allowing for a reasonable substitute when the market price for the product at issue is not readily available); (Ex. T, Vinmar's Damage Report, p. 3).  Vinmar properly accounted for all expenses Vinmar would have incurred in transporting the product to Europe, storing it, and

---

[10]     The CFPP value is a measure of quality relating to product's coagulation temperature point.  (Ex. X, Dep. of D. Friedman, p. 113).

reselling it into Europe.  (Ex. X, Dep. of D. Friedman, pp. 145-47); (Ex. Y, Dep. of C. Lokey, p. 105-08); (Ex. T, Vinmar's Damage Report, p. 3); (Ex. W, Dep. of B. Carmichael, pp. 257-58) (agreeing with reasonableness of Vinmar's expense figures as "typical").

35.   The loss that resulted from e-biofuels' failure to deliver the product could not reasonably have been prevented by cover or otherwise.  Vinmar is in the business of trading large volumes of commodities.  (Ex. X, Dep. of D. Friedman, pp. 92); (Ex. T, Vinmar's Damage Report, p. 1).  In 2008, Vinmar was an active buyer and seller of FAME B99 and other biodiesel products.  (Ex. X, Dep. of D. Friedman, pp. 92); (Ex. T, Vinmar's Damage Report, p. 1).  In this context, even if Vinmar had purchased FAME B99 through another supplier, the purchases of additional FAME B99 would not have constituted a "cover" purchase that would serve to reduce the damages because the FAME B99 e-biofuels failed to deliver resulted in lost volume damages.

36.   For example, in *Precision Pine & Timber, Inc. v. U.S.*, 63 Fed. Cl. 122 (2004) (Ex. CC), a timber purchaser sued the Government for improperly suspending a number of sales contracts pending its compliance with the Endangered Species Act.   The Government argued that the profit from the purchaser's post-suspension sales should offset the damages.  In rejecting the Government's argument, the court reasoned:

> Expectancy damages are intended to give the non-breaching party "the benefits he expected to receive had the breach not occurred." .
> . .
>
> In support of its position, plaintiff relies on "the lost volume seller" concept.  The government contends that the "lost volume seller" theory is inapposite because Precision Pine is the buyer in its timber sale contracts with the Government.  The Government's argument is incorrect and misses the point.  It is not necessary that Precision Pine be the seller *vis-à-vis* the Government.  Precision Pine is a seller of lumber products in the marketplace.  As such, it is entitled to rely on the "lost volume seller" theory.

> Lost volume damages are premised on the notion that had the supplier fully performed, plaintiff would have had the benefit of the original sale, and as a trader of the particular good, the profits from the subsequent sale as well. . . .

*Id.* at 132 (internal citations omitted); *see also Canusa Corp. v. A & R Lobosco, Inc.*, 986 F. Supp. 723, 732 (E.D.N.Y. 1997) (rejecting seller's argument that buyer's "cover" precluded recovery of lost profits as consequential damage where buyer was volume reseller); *Lone Star Ford, Inc. v. McCormick*, 838 S.W.2d 734, 740 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (holding that if the aggrieved party is free to enter into similar contracts with others, the fact that subsequent to the breach the aggrieved party could have made similar contracts does not reduce the damages). This approach also is consistent with the UCC's stated purpose to ensure that the aggrieved party is put in as good a position as if the other party had performed. *See, e.g., Canusa Corp.*, 986 F. Supp. at 732; TEX. BUS. & COM. CODE § 1.305.

### 3.   Vinmar is entitled to attorneys' fees.

37.    Through undisputed evidence, Vinmar demonstrated that it is entitled to $1,958,468 in damages it suffered as a result of e-biofuels' failure to complete performance under the agreements. In addition to these damages, pursuant to section 38.001, *et seq.*, of the Texas Practice and Remedies Code, Vinmar should be awarded $100,000 in reasonable attorneys' fees and expenses. TEX. PRAC. & REM. CODE § 38.001, *et seq.*; (Ex. U, Affidavit of K. Yagi in Support of Attorneys' Fees and Expenses). Further, Vinmar should be awarded not less than $25,000 in additional attorneys' fees for work required in the event that e-biofuels appeals the case to the court of appeals, and not less than $15,000 in additional attorneys' fees in the event that e-biofuels appeals this case to the Supreme Court of the United States. (*Id.*)

23

# VI.
## CONCLUSION

38.    For these reasons, Vinmar Overseas, Ltd. requests that the Court grant its motion

for summary judgment, enter a judgment against e-biofuels, LLC, awarding Vinmar $1,958,468

in damages, $100,000 in attorneys' fees and expenses, appellate attorneys' fees as requested

herein, costs of court, prejudgment and post-judgment interest at the highest rate allowed,[11] and

grant such other and further relief to which it is entitled.

Respectfully submitted,

By _____
     Stephen H. Lee
     State Bar No. 00791092
     So. District Bar No. 18313

**DOYLE, RESTREPO, HARVIN & ROBBINS, L.L.P.**
600 Travis Street, Suite 4700
Houston, Texas 77002
(713) 228-5100 (telephone)
(713) 228-6138 (facsimile)
slee@drhrlaw.com (e-mail)

**ATTORNEY-IN-CHARGE FOR PLAINTIFF,
VINMAR OVERSEAS, LTD.**

---

[11]    State law governs the award of prejudgment interest in diversity cases. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 435 (5th Cir. 2003). Thus, the applicable rate of prejudgment interest is 5%. *See Meridien Hotels, Inc. v. LHO Financing Partnership I, L.P.*, 255 S.W.3d 807, 823 (Tex. App.— Dallas 2008, no pet.) ("In a breach of contract case, the pre-judgment interest rate is the same as the post-judgment interest rate."); *see also* TEX. FIN. CODE § 304.003 (setting post-judgment interest rate); http://www.occc.state.tx.us/pages/int_rates/Index.html for the current interest rate.    In this case, prejudgment interest began accruing on $1,958,468 from the day suit was filed. *See, e.g., Cushman & Wakefield, Inc. v. Fletcher*, 915 S.W.2d 538, 547 (Tex. App.—Dallas 1995, writ denied); *Johnson & Higgins of Tex. Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 528 (Tex. 1998).

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the above and foregoing instrument have been served upon the following counsel by e-file and U.S. first class mail on June 30, 2009:

John H. Lewis
Lewis and Wilkins LLP
20 North Meridian Street, Suite 400
Indianapolis, IN 46204

_____
Stephen H. Lee

25