IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| VINMAR OVERSEAS, LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-1440 |
| | § | |
| E-BIOFUELS, LLC, | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND ANALYSIS OF THE LAW AND EVIDENCE**

After all parties have rested and closed the evidence, and
having heard and considered the arguments and authorities of
counsel, the Court makes the following findings of fact and
conclusions of law pursuant to Fed. R. Civ. P. 52.

**Prior Proceedings**

By Memorandum and Order signed and entered October 16, 2009,
which is incorporated herein, the Court granted in part the Motion
for Summary Judgment filed by Plaintiff Vinmar Overseas, Ltd.
("Vinmar"), and adjudged Defendant E-Biofuels, LLC ("E-Biofuels")
liable for breach of each of two contracts made by the parties on
January 3, 2008, which are the subject of this breach of contract
case.  After entry of the foregoing Order, there remained for trial
Vinmar's claim for its damages caused by E-Biofuels's breach of
each of the two contracts, and Vinmar's request for attorney's

fees.   The case came on for trial on November 12, 2009, and both parties having waived a jury, the Court proceeded to hear and consider the evidence and the arguments and authorities presented by counsel.

### Findings of Fact

From a preponderance of the evidence, the Court finds as follows:

1.   Vinmar and E-Biofuels entered into two separate contracts (evidenced by broker confirmations dated January 3, 2008) under which E-Biofuels agreed to sell a total of 1,500,000 gallons of FAME B99, a type of biodiesel, to Vinmar.   Under the first agreement, E-Biofuels was required to provide a total of one million gallons to Vinmar at $2.25 per gallon at a rate of 500,000 gallons per month or 125,000 gallons per week in January and February 2008.   Under the second contract, E-Biofuels was required on a similar schedule to ship to Vinmar 500,000 gallons in March 2008 at $2.35 per gallon.

2.   All deliveries were required to be made on track via loaded railcar at Vopak Deer Park, Texas.

3.   Prior to formation of the two contracts on January 3, 2008, E-Biofuels and Vinmar had had no dealings with each other and none of the employees in the two companies had contact information for or acquaintance with each other.

4.   Vinmar is a privately owned business headquartered in Houston, which has been in the chemical and fuel business since 1986. It has approximately 350 to 400 employees, and worldwide offices. Only recently, however, in 2006 did Vinmar for the first time engage in the purchase of any biofuels.

5.   E-Biofuels is a small company in the business of producing biofuels. Its employee Brian Carmichael had as one of his assignments the responsibility to handle all sales for the company.

6.   E-Biofuels had no sales department except for Brian Carmichael.

7.   The biofuels business has been in decline in recent years, as evidenced by there having been at one time as many as 150 producers of biofuels, which number is now down to about 20.

8.   Transactions for the sale and purchase of biofuels are commonly consummated through the efforts of independent brokers, who negotiate between potential sellers and buyers with regard to volume, specifications, price, and delivery dates.

9.   Only after the volume of the product, its specifications, price, and dates of delivery have been mutually agreed does the broker reveal to the parties their counterparty to the contract.

10. IVG Energy, Ltd. ("IVG") was the broker that brought Vinmar and E-Biofuels together on the two contracts that are the subject of this case and, after terms were agreed by E-Biofuels and Vinmar as to the volume, specifications, price, and delivery dates for the FAME B-99 to be sold and purchased, each party learned of the other party's identity. This occurred on January 3, 2008.

11. On January 14, 2008, E-Biofuels shipped 25,000 gallons of FAME B99 to Vinmar. On January 16, 2008, E-Biofuels shipped another 25,000 gallons of FAME B99 to Vinmar. No other shipments were made and thus E-Biofuels almost immediately fell behind on its obligation to ship 125,000 gallons per week, although E-Biofuels continued to say that it would perform.

12. On January 17, 2008, Vinmar contracted through IVG to purchase from another vendor an additional 300,000 gallons of FAME B99, to be delivered to Vopak Deer Park between January 21 and February 15, 2008.

13. On January 24, Vinmar telephoned the broker, IVG, about the scheduling of E-Biofuel's railcars, stating that it needed to know "where the next five-ten railcars are," requesting the railcar numbers, and stating that Vinmar expected the cars "to ratably show up at there [sic] tanks and need[ed] to have there [sic] scheduler know when they are coming."

14. When no further shipments had been made by E-Biofuels after the first 50,000 gallons, Vinmar's Doug Friedman met E-Biofuels's Brian Carmichael in Florida on February 6, 2008, and told Carmichael that Vinmar was going to hold E-Biofuels to the contracts, and that Vinmar had sold the material forward and needed "to cover."

15. In their February 6th meeting, Friedman did not state to Carmichael that Vinmar could not "cover" E-Biofuels's breach if E-Biofuels failed to perform the contracts.

16. The next day, on February 7, 2008, Vinmar contracted through IVG to purchase 150,000 gallons of FAME B99 from another vendor, to be delivered at Vopac Deer Park, Texas, between February 7 and February 29, 2008.

17. By February 25, 2008, if not before, Vinmar concluded that E-Biofuels would not perform on the first contract for deliveries in January and February and was in breach of the first contract, which required delivery of a total of 1,000,000 gallons of FAME B99 in January and February, 2008.

18. Within seven days after February 25, 2008, Vinmar contracted through IVG to purchase from other vendors 1,012,000 gallons of FAME B99.

19. Vinmar sued E-Biofuels on February 29, 2008, for breach of the first contract.

20.  The 1,012,000 gallons of FAME 99 referred to in Finding No. 18
     were purchased as follows:

| Confirmation Date | Delivery Period | Price per Gallon | Seller | Broker | Quantity (gallons) |
|---|---|---|---|---|---|
| 2/27/2008 | 3/1/2008 – 3/31/2008 | $2.97 | Redacted | IVG Energy, Ltd. | 612,000 |
| 2/28/2008 | 3/1/2008 – 3/31/2008 | $2.95 | Redacted | IVG Energy, Ltd. | 300,000 |
| 3/3/2008 | 3/3/2008 – 3/31/2008 | $3.02 | Redacted | Not listed | 100,000 |

21.  On March 3, 2008, Vinmar demanded immediate written assurance
     from E-Biofuels that it would fulfill its contractual
     obligation under the second contract to deliver 500,000
     gallons of FAME B99 to Vinmar during the month of March, 2008.

22.  The next day, on March 4, 2008, E-Biofuels responded through
     its counsel in effect to repudiate E-Biofuels's performance
     under the second contract.

23.  After E-Biofuels repudiated the second contract, Vinmar on
     March 25, 2008, contracted to purchase between 2,200 and 2,500
     metric tons of FAME B99.9 biodiesel, with Vinmar having the
     option to specify the exact volume, to be delivered to Vinmar
     at Jacksonville, Florida (Westway Terminal).

24.  One metric ton of FAME B99 biodiesel is the equivalent of
     approximately 300 gallons of this product.

25. Vinmar therefore agreed to purchase under the foregoing contract at least 660,000 gallons of FAME B99.9 biodiesel with an option to purchase up to 750,000 gallons, all of which was to be delivered during a loading window of April 1-10, 2008.

26. Although Vinmar's Friedman conclusorily testified that Vinmar could not "cover" the amount of the contracts because there was no "excess material available," Vinmar presented no evidence of its having unsuccessfully made any specific effort or efforts in good faith and without unreasonable delay to purchase or to contract for purchase of additional volumes of FAME 99 biodiesel over and above its proof that after E-Biofuels breached the two contracts, Vinmar successfully purchased more than 1,660,000 gallons of FAME 99 or FAME 99.9 all for delivery during March and the first ten days of April, 2008.

27. Vinmar succeeded in avoiding lost profits by its success in obtaining "cover" for the volume of FAME 99 that E-Biofuels failed to deliver.

28. Although Vinmar's Friedman testified that Vinmar "intended" to resell the FAME B99 biodiesel in the European market, Vinmar presented no evidence of any contracts that it had made to sell forward to any purchaser in Europe any quantity whatever of FAME B99 at any time during the year 2008.

29.   Likewise, Vinmar presented no evidence that it had ever sold any FAME B99 to any purchaser in Europe before 2008.

30.   The FAME B99 biodiesel contracted to be purchased from E-Biofuels, as well as the 1,672,000 gallons of biodiesel later purchased by Vinmar from other vendors after E-Biofuels breached the contracts, was not suitable for resale in the European market.

31.   Vinmar's Friedman testified that Vinmar expected to receive E-Biofuels's FAME B99 into its shore tanks at Deer Park, Texas, where it would blend or otherwise convert the product to a grade of biodiesel suitable for resale in Europe.

32.   Vinmar offered no evidence to establish that it had the capacity in its shore tanks in Deer Park or elsewhere to store and blend or convert to specifications suitable for Europe the 1,450,000 gallons of biodiesel that E-Biofuels failed to deliver *in addition* to its storage, blending and conversion of the 1,672,000 gallons of biodiesel that Vinmar purchased between February 27 and March 25, 2008, after E-Biofuels breached its contracts.

33.   Vinmar has not established by a preponderance of the evidence that during the first three or four months of 2008, that it had the capacity and ability to obtain purchaser(s) in Europe and to deliver to Europe the non-delivered 1,450,000 gallons of biodiesel after "making" it suitable for resale in Europe

*in addition* to "making" suitable and selling and delivering to purchaser(s) in Europe the 1,672,000 gallons of biodiesel that Vinmar purchased in the four-week period from February 27 to March 25, 2008, after E-Biofuels breached its contracts.

34. There is no evidence of Vinmar's total tank storage capacity, nor of its blending, resale, and delivery capabilities from which one could find that it could have received, processed for resale, sold, and delivered as many as approximately double the numbers of gallons of FAME B99 biodiesel that E-Biofuels failed to deliver and which it made up by Vinmar's purchases of biodiesels after E-Biofuels breached the contracts.

35. When E-Biofuels breached its contracts, Vinmar was not a lost volume seller of biodiesel into European markets or elsewhere.

36. Apart from E-Biofuels assuming that a purchaser of as many as 1.5 million gallons of FAME B-99 biodiesel was a reseller of the product, E-Biofuels had no knowledge of Vinmar's specific business or of its actual or possible resale markets.

37. There is no evidence that E-Biofuels at the time of contracting with Vinmar had reason to know of any general or particular requirements and needs of Vinmar which could not reasonably be prevented by cover or otherwise in the event that E-Biofuels breached the contracts.

38.   Vinmar has not proven that it sustained lost profits from E-Biofuels's breaches of the contracts.

39.   Vinmar did not sustain consequential damages from E-Biofuels's breaches of the contracts.

40.   Vinmar suffered price differential damages in the amount of $389,500 for E-Biofuels's non-delivery of 950,000 gallons of FAME B99 under the first contract, and price differential damages in the amount of $380,000 for E-Biofuels's non-delivery of 500,000 gallons of FAME B99 under the second contract.

41.   Vinmar's total price differential damages suffered by reason of E-Biofuels's breaches of both contracts was $769,500, which amount of damages (given the Court's prior ruling of liability on summary judgment) E-Biofuels conceded during trial that it does not contest.

## Conclusions of Law

**The Court makes the following conclusions of law:**

1.   The Court has jurisdiction of the parties and of the subject matter of this case.

2.   Section 2.713 of the Texas Business and Commerce Code provides a buyer's measure of damages for a seller's non-delivery:

> (a)   Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-delivery or repudiation by the seller is the difference between

10

> the market price at the time when the buyer learned
> of the breach and the contract price together with
> any incidental and consequential damages provided
> in this chapter (Section 2.715), but less expenses
> saved in consequence of the seller's breach.
>
> (b)  Market price is to be determined as of the
> place for tender or, in cases of rejection after
> arrival or revocation of acceptance, as of the
> place of arrival.

TEX. BUS. & COM. CODE § 2.713.

3.    Section 2.715 of the Texas Business and Commerce Code provides

the measure of a buyer's consequential damages:

> Consequential damages resulting from the seller's
> breach include  .  .  .  any loss resulting from
> general or particular requirements and needs of
> which the seller at the time of contracting had
> reason to know and which could not reasonably be
> prevented by cover or otherwise.

TEX. BUS. & COM. CODE § 2.715(b).

4.    A buyer in the business of reselling can obtain lost profits

for a seller's breach by first establishing that the seller

had reason to know, at the time of contracting, that the buyer

was planning to resell the goods in question or was in the

business of reselling. Canusa Corp. v. A&R Lobosco, 986 F.

Supp. 723, 732-33 (E.D.N.Y. 1997); see also Jerry Parks Equip.

Co. v. Se. Equip. Co., Inc., 817 F.2d 340, 343 (5th Cir.

1987) (stating that buyer could recover lost profits for

tractor it purchased from seller with the intent to resell

because seller knew that buyer was going to resell the

tractor).

5.   The mere fact, however, that a seller has reason to know that the buyer is a reseller at the time of contracting does not, without more, entitle the buyer to consequential damages.  The buyer also bears the burden to show that the consequential damages it seeks could not reasonably be prevented by cover or otherwise.  TEX. BUS. & COM. CODE § 2.715(b); *see also* <u>Wilson v. Hayes</u>, 544 S.W.2d 833, 836 (Tex. App.--Waco 1976, writ ref'd n.r.e.) (awarding market differential damages to the buyer for the seller's breach but vacating the jury's award of consequential damages because there was no evidence that the buyer could not have mitigated his loss by cover); <u>Happy Dack Trading Co., Ltd. v. Agro-Indus., Inc.</u>, 602 F. Supp. 986, 994 (D.C.N.Y. 1984) ("Where, as here, the buyer seeks to recover profits lost when the seller failed to deliver goods that the buyer had intended to resell at a profit, the buyer must show that 'the seller at the time of contracting had reason to know' that buyer would lose profits, and that the lost profits 'could not be reasonably prevented by cover or otherwise,' for instance, by purchasing substitute goods in the open market for resale." (quoting N.Y.U.C.C. § 2-715(2)(a)).

6.   Although an exact calculation of lost profits is not required, lost profits must be proven by competent evidence with reasonable certainty.  <u>Holt Atherton Indus., Inc. v. Heine</u>, 835 S.W.2d 80, 84 (Tex. 1992).

7.    The bare assertion that contracts were lost is insufficient to constitute reasonably certain objective proof that profits were in fact lost. Id. at 85.

8.    A buyer seeking lost profit damages as a "lost volume seller" must also sufficiently demonstrate lost sales. Nycomed US Inc. v. Abbott Labs., 542 F.3d 1129, 1132 (7th Cir. 2008).

9.    The inquiry into whether Vinmar is entitled to lost profit damages as a lost volume reseller is a question of fact:

> Whether a subsequent transaction is a substitute for the broken contract sometimes raises difficult questions of fact. If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract. Since entrepreneurs try to operate at optimum capacity, however, it is possible that an additional transaction would not have been profitable and that the injured party would not have chosen to expand his business by undertaking it had there been no breach. It is sometimes assumed that he would have done so, but the question is one of fact to be resolved according to the circumstances of each case.

RESTATEMENT (SECOND) OF CONTRACTS § 347 cmt. f (1981).

10.   Vinmar's absence of proof that it actually had the storage and blending capacities and capabilities, as well as the ability to deliver and resell in Europe incremental volumes of biodiesel of the magnitude claimed herein, requires holding as

13

a matter of law that Vinmar was not a lost volume seller. *See*
Nycomed, 542 F.3d at 1131-32.

11.  Vinmar is entitled to recover from E-Biofuels the price
     differential damages proven by Vinmar and unopposed by
     E-Biofuels in the total sum of $769,500, plus prejudgment
     interest and attorney's fees.

12.  Where jurisdiction is predicated upon diversity of
     citizenship, state law governs the rate of prejudgment
     interest. Boston Colony Ins. Co. v. Tiner Assocs., Inc., 288
     F.3d 222, 234 (5th Cir. 2002). Texas common law allows
     prejudgment interest on damages awarded for breach of
     contract. Int'l Turbine Servs., Inc. v. VASP Brazilian
     Airlines, 278 F.3d 494, 500 (5th Cir. 2002). In a breach-
     of-contract cause of action, prejudgment interest is
     calculated as simple interest and is based on the postjudgment
     interest rate applicable at the time of judgment. Johnson &
     Higgins, Inc. v. Kenneco Energy, 962 S.W.2d 507, 532 (Tex.
     1998). Under Texas common law, prejudgment interest begins to
     accrue on the earlier of (1) 180 days after the date the
     defendant receives a written notice of a claim, or (2) the
     date suit is filed. Id. at 531.

13.  Prejudgment interest will accrue on the first contract from
     February 29, 2008, the date Vinmar filed suit for breach of
     the first contract.

14.   Vinmar's Original Petition did not include a claim for breach
      of the second contract, and Vinmar never amended its pleading
      to include such a claim.  E-Biofuels, however, never objected
      to Vinmar's claim for damages on the second contract before,
      during or after trial.  Indeed, E-Biofuels both at the summary
      judgment stage and at trial contested on the merits Vinmar's
      claim for damages caused by E-Biofuels's breach of the second
      contract.  Vinmar's claim for breach of the second contract
      was therefore tried by consent.  *See* FED. R. CIV. P. 15(b); *see*
      *also* Deere & Co v. Johnson, 271 F.3d 613 (5th Cir. 2001);
      Fejita v. GAF Companies, Inc., 800 F.2d 1395, 1396 (5th Cir.
      1986).

15.   Because Vinmar's Original Petition did not include a claim for
      breach of the second contract, its claim for prejudgment
      interest accrued 180 days after E-Biofuels received written
      notice of Vinmar's claim on the second contract.  E-Biofuels
      received written notice of a claim under the second contract
      on March 3, 2008, when Vinmar demanded, in writing, immediate
      written assurance from E-Biofuels that it would fulfill its
      contractual obligation under the second contract.  Cotter v.
      Tobey, No. 04-04-82-CV, 2005 WL 291462, at *3 (Tex. App.--San
      Antonio Feb. 9, 2005, no pet. hist.) (noting that demand
      letter constituted written notice for purposes of calculating
      prejudgment interest).  Therefore, prejudgment interest on the

15

second contract will accrue beginning 180 days after March 3, 2008, which is August 30, 2008.

16. The current rate of postjudgment interest is 5 percent (5%), as determined by the Consumer Credit Commissioner in accordance with Texas Finance Code Section 304.003(c). TEX. FIN. CODE. ANN. § 304.003(c) (Vernon's 2006).[1]

17. For breach of the first contract, Vinmar is entitled to recover $33,881.16 in prejudgment interest on its differential damages proved in the amount of $389,500, from February 29, 2008, to the date of this Order, plus additional prejudgment interest accruing in the amount of $53.35 per day from the date of this Order until entry of Final Judgment.

18. For breach of the second contract, Vinmar is entitled to recover $23,476.71 in prejudgment interest on its differential damages proved in the amount of $380,000 from August 30, 2008, to the date of this Order, plus additional prejudgment interest accruing in the amount of $52.05 per day from the date of this Order until entry of Final Judgment.

19. Vinmar is also entitled to reasonable attorney's fees for that portion of its claims that it successfully proved. TEX. CIV. PRAC. & REM. CODE § 38.001; *see also* DP Solutions, Inc. v. Rollins, Inc., 353 F.3d 421, 436 (5th Cir. 2003).

---

[1] Office of Consumer Credit Commissioner, http://www.occc.state.tx.us/pages/int_rates/Index.html.

20. If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.

## Analysis of the Law and Evidence

It is uncontroverted that Vinmar suffered market price differential damages in the amount of $389,500 for E-Biofuels's non-delivery of 950,000 gallons of FAME B99 under the first contract, and price differential damages in the amount of $380,000 for E-Biofuels's non-delivery of 500,000 gallons of FAME B99 under the second contract. E-Biofuels conceded at trial that, given the Court's ruling on summary judgment that E-Biofuels breached the contracts, it does not contest these damages. The remaining issue, which was the focus of the trial, is whether Vinmar is entitled also to consequential damages.

Vinmar seeks consequential damages for lost profits it allegedly would have earned by reselling in Europe all of the biodiesel that E-Biofuels failed to deliver to Vinmar at Volpak Deer Park, Texas. Paraphrasing Vinmar's closing argument: E-Biofuels knew that Vinmar was in the business of reselling biodiesel, and because of that knowledge, Vinmar should be entitled to its lost profits as consequential damages because Vinmar is a "lost volume seller," could not "cover" E-Biofuels's non-delivery,

17

and could have profitably sold all of the non-delivered biodiesel plus all that it purchased from others into European markets.   An award of consequential damages based on lost profits, however, requires much more than the *ipse dixit* of the claimant that he has been damaged or that he lost profits.   *See* Holt Atheron Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992) ("[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective determination of lost profits.").

Vinmar's Doug Friedman conclusorily testified that during the first quarter of 2008, Vinmar could not "cover" the amount of the contracts because there was no "excess material available." Friedman, however, did not support this conclusion with any specific facts or evidence to establish that Vinmar had in fact actively but unsuccessfully sought to purchase greater volumes of biofuel than those volumes that Vinmar *did* purchase, which reasonably approximated the volumes that E-Biofuels had failed to deliver.   Friedman did not claim to have personally failed in efforts to secure through IVG or other brokers additional volumes to cover, no other employee of Vinmar was called to provide such evidence, and neither IVG nor any other broker was called to testify that biodiesel was not sufficiently available in the marketplace to cover E-Biofuels's breaches of contract.   The only documentation regarding Vinmar's efforts to purchase biodiesel are its proof of *successfully* making contracts to purchase biofuels as

described in Findings of Fact Nos. 12, 16, and 18-25.  Indeed, an analysis of the quantities and timing of these purchases undercut, rather than support, Vinmar's assertion that it was buying as much suitable biodiesel as was available and therefore would have bought even more biodiesel regardless of E-Biofuels's breach.

For example, it required only seven days for Vinmar to purchase from other vendors 1,012,000 gallons of FAME B99 after February 25, 2008, when Vinmar had reason to know that E-Biofuels would not deliver the 950,000 gallons remaining to be delivered on the first contract, and was therefore in breach.  On March 4, 2008, E-Biofuels repudiated the second contract, which required delivery of 500,000 gallons of FAME B99 from March 3-28, 2008.  Within three weeks, Vinmar purchased at least 660,000 gallons of FAME B99.99 for delivery from April 1-10, 2008, with an option to purchase up to 750,000 gallons.  Even the fact that Vinmar took an option on 90,000 gallons of FAME B99.9 under that contract evidences that Vinmar might choose *not* to buy all of the biofuel that was available to it.  The trial record is silent on whether Vinmar did or did not exercise this option.  In any event, what *is* proven is that Vinmar purchased 1,672,000 gallons of biodiesel between February 27 and March 25, 2008, which was fully sufficient to cover the 1,450,000 gallons that E-Biofuels failed to deliver, and what is *not* proven is that Vinmar still would have bought that 1,672,000 gallons if E-Biofuels had not breached its contracts.  In short,

19

Vinmar has not met its burden to show that it could not or did not prevent its loss by cover or otherwise.

Vinmar asserts that it is entitled to lost profit damages as a lost volume seller and cites as its principal authority Canusa Corporation v. A&R Lobosco, Inc., 986 F. Supp. 723 (E.D.N.Y.). In Canusa, a recycler and broker of waste paper contracted with a seller to purchase in 1993 a minimum 1,100 tons per month of a certain quality of old newsprint, and 1,500 tons per month thereafter. The seller failed to deliver the minimum tonage in the first month, delivered even less in the months that followed, and after seven months ceased all deliveries to the plaintiff although it was making deliveries to other purchaser(s). The plaintiff-buyer proved by substantial evidence in Canusa that it could have sold in a rising market all of the material the seller was producing in addition to any cover that the purchaser obtained, and the court awarded damages accordingly.

The difference between the plaintiff's proof in Canusa and Vinmar's lack of proof in this case is highlighted by the language of the Seventh Circuit in Nycomed US Inc. v. Abbott Laboratories:

> [T]he [lost volume seller] doctrine cannot be applied
> blindly in the case of a so-called buyer-reseller who is
> the nonbreaching party, because in such a case there is
> no automatic proof of a lost sale and therefore lost
> profit. . . .  When the nonbreaching party is a buyer,
> the breach of contract does not necessarily mean that

there was a lost sale.  Lost sales must be shown
separately.

<u>Nycomed</u>, 542 F.3d at 1132.

In <u>Nycomed</u>, an ointment manufacturer sued the supplier of a
key ingredient used to make its ointment because the supplier
delivered a tainted batch of the ingredient.  <u>Id.</u> at 1130-31.  The
manufacturer had to recall and destroy all tubes of ointment made
from that batch and work overtime to satisfy all of its orders for
ointment.  <u>Id.</u> at 1131.  Both parties agreed that the manufacturer
was entitled to damages for (1) the direct costs (materials, etc.)
of making the tainted ointment; (2) costs of destroying that
ointment; and (3) extraordinary costs (overtime) of making replace-
ment ointment.  <u>Id.</u> at 1132.  The manufacturer also sought lost
profits from the sales of ointment that it could have made.
According to the manufacturer, it "would have made, sold and
profited from the sale of, both the product [it] was required to
destroy as a result of [the supplier's] breach, and the product
made in the wake of the recall to replenish [its] inventory." <u>Id.</u>
at 1131.  The Seventh Circuit rejected the manufacturer's claim for
lost profits, finding *as a matter of law* that the manufacturer
failed to establish that it lost sales as a result of the
supplier's breach.  <u>Id.</u> at 1131-32.

The Seventh Circuit distinguished <u>Canusa</u>, finding that in
<u>Canusa</u> the nonbreaching buyer "sufficiently demonstrated loss of

21

sales" during the trial and, therefore, the district judge's finding that the buyer was entitled to lost profit damages as a volume reseller was appropriate. Nycomed, 542 F.3d at 1132. The circuit parenthetically noted that in Canusa (1) the buyer provided "'substantial evidence in the form of testimony of a rising market in the relevant period,'" (2) the breaching seller "'[did] not contest that there was a viable market for'" the paper the buyer intended to resell, and (3) the buyer established that it "sold all the [paper] it acquired" and could have sold all of the paper the supplier failed to deliver. Id. (citing Canusa, 986 F. Supp. at 732).

In Nycomed, however, the Seventh Circuit found that the buyer-manufacturer did not sufficiently demonstrate lost sales because it failed to show that it had the capacity to produce and sell ointment made from the supplier's batch *in addition to* the ointment it subsequently made and sold. Id. at 1131-32. Vinmar's claim for lost profit damages fails for similar reasons. The FAME B99 biofuel delivered to Vinmar in Volpak Deer Park, Texas, did not meet specifications for resale in Europe, which was Vinmar's only lost sales damage model. Vinmar's Friedman testified that Vinmar could convert or "make ready" the biofuel into a product that would be suitable for the European market, although it offered no proof that it had ever made any sales of biofuels to buyers in Europe during the brief period since 2006 when Vinmar first bought

biofuels.  In order for Vinmar to show lost sales on 1,450,000 gallons of biodiesel that E-Biofuels failed to deliver (which the evidence showed would require as many as 59 railcars to deliver), Vinmar would need to show it had capacity to receive, store, and convert for resale in Europe this volume of biodiesel *in addition* to the other similar volumes of biodiesel that it procured from other vendors after E-Biofuels's breach.  Vinmar presented no such evidence that it had the incremental capacity to store and/or convert FAME B99 biodiesel in Deer Park, Texas, or anywhere else, in such sizable incremental volumes.

In addition, Vinmar failed to show that it could actually sell in Europe the incremental volume that E-Biofuels failed to deliver. In <u>Canusa</u>, the buyer-reseller proved that it did in fact sell all of the paper that it received.  <u>Canusa</u>, 986 F. Supp. at 732.  Here, there is no evidence that Vinmar made *any* resales of biodiesel either to buyers in Europe or elsewhere in the Spring of 2008 or at *any* time, and it conceded it had no contracts for such resales to proffer in evidence.[2]  "[T]he bare assertion that contracts were lost does not demonstrate a reasonably certain objective

---

[2] Vinmar did exhibit some partially redacted sales contracts for FAME B99 transactions in Europe made either by Vinmar Chemicals and Polymers BV or Vinmar International Ltd., but admitted that those two companies are both separate companies from the Vinmar that is Plaintiff in this case.

23

determination of lost profits." Holt Atheron Indus., Inc. v. Heine, 835 S.W.2d 80, 85 (Tex. 1992).

In Holt, the Supreme Court of Texas reversed a judgment awarding $120,000 lost profits. The plaintiff had taken his bulldozer to the defendant for repairs under a claimed warranty that the defendant did not recognize, and the defendant held the bulldozer for eight months. Id. at 82. The plaintiff conclusorily claimed "lost income" of $200,200 from his loss of use of the bulldozer during those months. Id. at 84. The plaintiff failed to show, however, that there was enough work to keep the bulldozer working and, while testifying that he lost several contracts because he did not have the bulldozer available, he did not specify which contracts he lost, how many he lost, who would have awarded him the contracts, and how much profit he would have made from those specific lost contracts. Id. at 85. The court held that the evidence was legally insufficient to provide a reasonable basis for determining the plaintiff's lost profits. Similarly, Vinmar failed to offer proof sufficiently to demonstrate any loss of sales such as to entitle it to damages as a lost volume seller. Vinmar is not entitled to consequential damages.

### Order

For the reasons set forth in the foregoing Findings of Fact, Conclusions of Law, and Analysis of the Law and Evidence, it is

ORDERED that Vinmar Overseas, Ltd. shall have and recover from
E-Biofuels LLC, price differential damages in the amount of
$389,500 for E-Biofuels's breach of the first contract, together
with prejudgment interest thereon to the date of this Order in the
amount of $33,881.16; plus price differential damages in the amount
of $380,000 for E-Biofuels's breach of the second contract,
together with prejudgment interest thereon to the date of this
Order in the amount of $23,476.71; and prejudgment interest shall
continue to accrue from the date of this Order until the entry of
a Final Judgment in the daily amount of $53.35 on the first
contract and $52.05 on the second contract; and it is further

ORDERED that the parties shall attempt in good faith to reach
agreement on the reasonable and necessary amount of attorney's fees
that should be awarded to Vinmar, taking into consideration the
results obtained by Vinmar, that is, the claims upon which it
prevailed but also those upon which it did not prevail and for
which it is not entitled to recover attorney's fees. Mercier v.
Sw. Bell Yellow Pages, Inc., 214 S.W.3d 770, 775-76 (Tex. App.--
Corpus Christi 2007, no pet. hist.) (noting that the trial court
has discretion in determining the amount of a reasonable and
necessary attorney's fee, and may consider the results obtained in
setting the fee). To facilitate the parties reaching agreement,
within ten (10) days after the date of entry of this Order,
Vinmar's counsel shall make available for E-Biofuels's inspection

(1) any fee agreement he may have with Vinmar; (2) his time records (redacted as appropriate to protect any confidential attorney-client communication) upon which Vinmar relies for calculating reasonable attorney's fees; (3) the breakdown of the foregoing time records to allocate fairly the time expended by Vinmar on that portion of the case upon which Vinmar prevailed, as distinguished from time expended on Vinmar's unsuccessful claims; and (4) the amount of attorney's fees that Vinmar claims.  The parties shall then promptly confer in good faith to reach agreement upon the attorney's fees to be awarded.  Only if agreement is not reached after good faith negotiations, may Vinmar file its application for attorney's fees, with supporting affidavits, exhibits, and a brief in support (not to exceed 15 pages in length), which shall be filed (if necessary) within twenty-one (21) days after the date of entry of this Order.  Within ten (10) days after having been served with Vinmar's application and accompanying support, E-Biofuels may file a response together with supporting affidavits, exhibits, and a brief (not to exceed 15 pages in length).  Thereafter, Vinmar may file a reply (not to exceed 10 pages in length) within ten (10) days after having been served with E-Biofuels's response.

If the parties agree on the amount of attorney's fees and expenses to be awarded to Vinmar, such agreement shall be reported in a joint letter to the Court, and the agreement shall be without

26

prejudice to the right of either party to appeal from the Final Judgment.

The Clerk shall notify all parties and provide them with a true copy of these Findings of Fact and Conclusions of Law.

SIGNED at Houston, Texas, on this 25TH day of November, 2009.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE

27